STANKOVICH ET UX. *v.* VANNOY ET UX.

[No. 272, September Term, 1965.]

Decided April 27, 1966.

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY and McWILLIAMS, JJ., and CARTER, J., Chief Judge of the Second Judicial Circuit, specially assigned.

*Charles A. Herndon, Jr.,* with whom was *Gordon C. Murray* on the brief, for the appellants.

*A. Frederick Taylor,* with whom were *Martin & Taylor* on the brief, for the appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Both appellants (Stankovich and wife) and appellees (the Vannoys) were victims of the blandishments of Andre H. Carrigan, a real estate promoter who was long on promises but short on fulfillment. A proper understanding of their troubles requires the narration of most of what has happened, despite the fact that we have already dealt with one rather narrow aspect of the controversy. See *Stankovich v. Lehman,* 230 Md. 426, 187 A. 2d 309 (1963).

In November 1951 the Vannoys bought a 60 acre farm in Carroll County improved by a dwelling and some outbuildings. Later it came to be known as Deer Park. The consideration was $15,000. Since they were both employed by the Social Security Administration, the farming operation was marginal.

Nevertheless it provided a measure of tranquility which they seem to have enjoyed.

Late in 1960 Carrigan called on the Vannoys and told them he was interested in buying the property. He had with him Otis B. Stewart, said to be a real estate broker. Although they had not thought of selling before Carrigan appeared on the scene their discussions finally resulted in the signing of a contract of sale. The contract, dated 19 November 1960, stated a purchase price of $30,000, $3,500 down, the balance to be paid in cash within 6 months. It contained also a provision allowing Carrigan and his agents "reasonable access * * * for the purpose of surveying, subdividing, engineering and selling." He was also allowed to "erect subdivision signs within the realm of good taste." It is perhaps an understatement to say that the circumstances in respect of the $3,500 down payment are somewhat bizarre. Carrigan produced a check for $1,500 payable to Stewart, which, he told the Vannoys, would have to be held by the "broker." One would have to be very naive to believe "the broker" was anything but Carrigan's alter ego. Carrigan did not offer to pay the balance of $2,000. About 8 months later, however, being pressed for cash, the Vannoys asked Carrigan to pay the $2,000. Carrigan was quick to oblige. He borrowed the money but it appears he had them endorse the note. At any rate they, not Carrigan, eventually paid it.

In a contract of sale dated 16 December 1960 Carrigan (and wife) agreed to sell to Stankovich [1] (and wife) 20 lots shown on a preliminary plat of Deer Park [2] for a down payment of $8,000, the $32,000 balance to be secured by a 90 day purchase money mortgage which contained a provision requiring Carrigan to construct the roads shown on the plat and a commitment that, at the time of settlement he (Carrigan) would "place $30,-000 in escrow for the purpose of completing all roads in the subdivision." The $8,000 down payment was accomplished by the execution and delivery of two $4,000 promissory notes, which Carrigan later sold for $2,800, contrary to a collateral

---

1. Stankovich is a speculative builder who carries on his business under the name of Edison Construction Co.

2. The streets have such quaint names as Doe Drive, Antler Lane, Fawn Way, etc.

agreement with Stankovich to hold them, all of which is the subject of other litigation.

On 28 December 1960 Carrigan sold Stankovich 10 more lots for $20,000 on substantially the same terms. The $4,000 down payment was accomplished by the execution and delivery of a $4,000 note which Carrigan agreed to hold but which, again in violation of his agreement, he sold for $2,800, and that is what *Stankovich v. Lehman, supra,* is all about.

On 6 April 1961 Carrigan proposed to the Vannoys that the settlement scheduled for 19 May be postponed until 19 July. Upon his promise to pay them an additional $4,000 in cash at the time of settlement, they agreed. They were also persuaded to convey 18 lots to grantees designated by Carrigan and on 13 April they executed a deed to Stankovich for 6 of the 18 lots. Not only did the Vannoys receive nothing for granting these lots but their mortgagee was persuaded to join in the execution of the deed without being paid anything on account of the mortgage debt.

On 16 July 1961 settlement was again extended, this time to 21 August. Also the terms of sale were changed to $25,500 in cash and an unsecured note for $8,500 for two years. On 20 August another change was made. Settlement date once more was extended (no date is mentioned) to "allow [Carrigan] to arrange for a $15,000 mortgage on the [Vannoys'] property." The Vannoys were now to receive $15,000 in cash (the proceeds of a mortgage on their own property), and a three year note for $13,710. They also agreed that "said note shall not constitute a mortgage on subject property."

It will be observed that, at this point, Carrigan, in effect, had obtained an indefinite (at least for 3 years) option on the Vannoys' land and limited possession thereof. He had persuaded them, as has been pointed out, to part with title to a number of the lots. All this he accomplished without putting up a penny of his own money. His big hurdle was getting hold of the $30,000 he agreed to put in escrow to guarantee the building of the roads. The testimony seems to indicate that he expected to raise this amount by discounting the notes he hoped to obtain from builders (as he did from Stankovich and a few others). It was not long, however, before the whole enterprise became

unstuck. As Stankovich sourly and succinctly put it, Carrigan "never paid nobody for nothing."

As for Stankovich, he built one house, which he said he sold for $15,000. His profit was $4,000. He still owns 5 lots for which he has paid nothing. In his testimony he said "nobody [has] approached me for a nickel yet." The Vannoys, upon the eventual default of Carrigan, sold their land to some one else. The details of this transaction are not in the record.

On 25 January 1962 Stankovich sued the Carrigans and the Vannoys in the Baltimore County Circuit Court. The declaration, aimed not only at the recovery of losses but the realization of anticipated profits as well, contained four counts in assumpsit and four counts on the case for deceit and fraud. It was claimed, in some counts, that Carrigan was acting as agent for undisclosed principals (the Vannoys) and in others that Carrigan and the Vannoys were either joint adventurers or partners. Damages in excess of $80,000 were claimed. Both the Vannoys and the Carrigans appeared by attorney and filed the usual general issue pleas.

In April the Vannoys served interrogatories on Stankovich in which they demanded further particulars of the alleged agency and joint adventure or partnership. Stankovich answered at length. The Vannoys excepted alleging the answers were inadequate. Stankovich replied again, this time *in extenso*.

Two years and four months later the case came on for trial before Judge Turnbull and a jury. The Carrigans did not appear at the trial, either in person or by attorney. A witness was produced who testified that he telephoned Carrigan on 15 February (two days before the trial), that he spoke with him for about 15 minutes and that Carrigan "was apprised of the fact that * * * [the case] was in the assignment for * * * [17 February]."

The jury was impaneled and sworn. Counsel for both parties, after completing their opening statements, approached the bench and after a colloquy between counsel and the court, out of the hearing of the jury, the court made the following statement:

> "Plaintiff moves to exclude evidence which would relate to the existence of a partnership between Mr.

and Mrs. Carrigan and Mr. and Mrs. Vannoy on the grounds that Rule 311 a. requires denial of the existence of a partnership in the next succeeding pleading.

"Subsection b. of Rule 311 provides [3] that, 'At any time prior to the beginning of trial, upon notice and for good cause shown, the Court may permit a pleading to be amended * * *. The motion for such an amendment shall be in writing and shall set forth the grounds therefor.'

"Subsection c. says that, 'Notwithstanding an admission by the pleadings, the Court may, in its discretion, require proof of any allegation upon such terms as to continuance, costs and other matters as justice may require.' "

\* \* \*

"\* \* \* The Court feels that, in the interest of justice, if indeed there was no partnership or joint venture, the defendants should be permitted to offer evidence to that effect. Therefore, in the exercise of the Court's discretion, even though the trial has started, the Court will declare a mistrial and, upon application, permit an amendment of the pleas filed by Mr. and Mrs. Vannoy.

"In the interest of going ahead with this trial, counsel agree in open court that it is unnecessary for the Court to declare a mistrial and grant a continuance; and it is also further stipulated in open court that Mr. Taylor, as counsel for Mr. and Mrs. Vannoy, can

---

3. Rule 311 b. "*Amendment.* At any time prior to the beginning of trial, upon notice and for good cause shown, the Court may permit a pleading to be amended to deny the partnership of any parties, incorporation of an alleged corporation, execution of a written instrument, or ownership of a motor vehicle. A motion for such an amendment shall be in writing and shall set forth the grounds therefor. If such amendment is allowed, subsequent procedure shall be pursuant to subsections d 1 (c), d 2, e 1 and f of Rule 320 (Amendment)."

prepare and file, in writing, his motion, setting forth his reasons, and file the same with the Court

* * *

". . . tomorrow morning, at which time the Court will determine whether or not his reasons are sufficient to permit the amendment. The plaintiffs object to this procedure, and the objection is overruled, and, of course, they have an automatic exception."

The trial went on and by the end of the day Stankovich had concluded his case. The following morning Judge Turnbull granted the Vannoys' motion for leave to file amended pleas, which were thereupon filed. The only change, of course, was the denial of the existence of a partnership. The jury retired at 3 :05 P. M. the same day and three hours later brought in a verdict for $25,000 in favor of Stankovich against Carrigan and a verdict in favor of the Vannoys against Stankovich. From the judgments entered a week later Stankovich has taken this appeal.

Stankovich contends, first, that the question whether a partnership between the Vannoys and Carrigan was created is foreclosed by the operation of Maryland Rule 311 a. The allegation that they were partners, he argues, was made 19 times in his pleadings and that he was claiming the existence of a partnership was made abundantly clear. Indeed, we might add, had he sent up a balloon and fired a cannon he could not have made it more clear. He emphasizes, also, the fact that the case was at issue for three years before it was reached for trial. The Vannoys insist, however, that their whole case is based on their denial that they were the partners of anyone and that it was because of an oversight of counsel that the allegation of partnership was not denied in the next succeeding pleading, as provided in Rule 311 a. In the motion for leave to amend counsel for the Vannoys conceded he "failed to consider" the effect of the Rule. If Rule 311 a were standing alone, as it did during the 86 years prior to 1956 when it was known as Art. 75, § 28 (108) (109) of the Code, there might be some merit in Stankovich's first contention. With the addition of Section

b (in 1961) (See note 3) and Section c (in 1956),[4] however, the trial judge was given wide discretion to mitigate the harshness of the rule. Indeed, Stankovich, in effect, acknowledges, in his next contention, that the amendments have that effect.

His second contention is that the trial judge was without authority to allow the amendment *after the trial had begun.* The Vannoys, on the other hand, say that Rule 320 a 1[5] and Rule 320 c 2[6] clothe the judge with the authority to allow the amendment. We think it is clear that the allowance of an amendment to deny the existence of a partnership is controlled by Rule 311 b and not by Rules 320 a 1 and 320 c 2. It will be noted that Rule 311 b provides that "subsequent procedure shall be pursuant to" Rule 320 d 1 (c), requiring the amendment to be in writing, Rule 320 d 2 relating to service of copies, Rule 320 e 1 governing the granting of a continuance in court trials, and Rule 320 f relating to costs. Significantly, Rule 311 b omits any reference to Rule 320 e 2[7] and in our judgment it is inapplicable in any situation where Rule 311 b is controlling. If we were to assess Judge Turnbull's decision to allow the amendment solely on the basis of Rule 311 b we might very well be obliged to conclude that his decision was erroneous. However, Rule 311 c makes it unnecessary for us to reach such a conclusion. Having become persuaded that "in the interest of justice * * * [the Vannoys] should be permitted to offer evidence" to prove that a partnership never existed, there was no need for the court to indicate an intention to allow an amend-

---

4. Until the present Section b was added in 1961, the present Section c was labeled Section b.

5. Rule 320 a 1. "Process, Pleadings and Record. The court may permit any of the proceedings, including process, pleadings, and record, to be amended so that the case may be tried on its merits."

6. Rule 320 c 2. "Trial before Jury. In a case tried before a jury, an amendment may be made at any time before the jury retires to make up its verdict."

7. Rule 320 e 2. "Trial before Jury—Mistrial. Where an amendment is allowed after a jury is sworn, the jury may proceed or continue to try the case after the amendment has been made, unless the court shall consider a continuance necessary for a fair trial, in which event the court shall declare a mistrial. (Art. 75, § 48.)"

ment to the pleadings and to suggest a willingness, *sua sponte*, to declare a mistrial for the obvious purpose of legitimizing the amendment and expediting its accomplishment. The situation called for nothing more than a ruling, pursuant to Rule 311 c, that the existence vel non of the partnership would be a question for the jury and that the plaintiff would have to offer evidence to prove that a partnership existed and if, in these circumstances, the plaintiff, being unprepared, had needed time to procure the necessary testimony or other evidence any resulting unfairness could have been obviated by ordering, not a mistrial, but a continuance. Since Judge Turnbull could have reached the same result by applying Rule 311 c, we cannot say that his proceeding under Rule 311 b was prejudicial, even though it may have been erroneous.

In his third and last contention Stankovich says that even if the court was authorized to admit evidence on the issue of partnership it was an abuse of discretion to do so. We do not agree.

During the opening statements of counsel Judge Turnbull must certainly have become aware of the predicament in which the Vannoys found themselves and the reason therefor. And if he, at that moment, suspected there might be a paucity of evidence available to prove partnership, it must be said that the evidence subsequently produced (perhaps it would be more accurate to say not produced) fully justified his suspicion.[8] We cannot say his concept of what "justice * * * [might] require" in respect of the parties, and the circumstances in which he found them, was so distorted or biased or unrealistic that it op-

---

**8.** The only evidence tending to prove the existence of a partnership is found in the following testimony of Stankovich:

"Q. Did you ask, or ever ask Mr. Carrigan what his relationship was with Mr. and Mrs. Vannoy?

"A. Well, on a few occasions I asked him what his dealings was with the Vannoys. The first time he told me he had a deal with the Vannoys.

"Q. A deal with the Vannoys? A. Yes, sir.

"Q. What did he mean by that, if he told you, if you know?

"A. Well, somehow or other I couldn't understand, I said, 'What kind of a deal?' He turned around, said, 'I'm in partnership with the Vannoys.' That's all I got out of the man."

350

erated to inform his discretion in such a manner that in exercising it, he abused it.

If what we suspect is true, the judgment against Carrigan is worthless and, for Stankovich, this is unfortunate. Even so it does not seem to us any great miscarriage of justice that his demands cannot be realized from the Vannoys.

*Judgment affirmed. Costs to be paid by the appellants.*